Estate of Joe Wright, Deceased, Joe E. Wright, Executor, and Lillian Wright v. Commissioner.
Estate of Wright v. Commissioner
Docket No. 86675,
United States Tax Court
T.C. Memo 1963-88; 1963 Tax Ct. Memo LEXIS 258; 22 T.C.M. (CCH) 404; T.C.M. (RIA) 63088; March 27, 1963
*258 Net Worth Method - The respondent's determination of taxable income upon the net worth method approved, subject to certain corrections in his computation. Raymond N. Foust, Esq., and Quentin L. Housholder, Esq., for the petitioners. Michael P. McLeod, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax of Joe Wright and Lillian Wright, and additions thereto, as follows: Additions
Sec. 293(b)
Sec. 6653(b)
Income
I.R.C.
I.R.C.
Year
Tax
of 1939
of 1954
1953
$ 637.56
$318.78
1954
4,523.01
$2,261.51
1955
2,294.47
1,147.24
1956
9,225.66
4,612.83
The respondent on brief concedes error in his determination of additions to tax for the taxable years 1953 through 1956 under sections 293(b) of the 1939 Code and 6653(b) of the 1954 Code; and he also concedes that assessment and collection of the deficiency in tax determined for the taxable year 1953 is barred by the statute of limitations. The petitioners now concede that assessment and collection of any deficiencies in tax for the taxable years 1954, 1955, and 1956 are not barred by the statute of limitations. There remain for decision several issues with respect to the correctness *259 of the respondent's computation of the petitioners' taxable income for the years 1954 to 1956, inclusive, by the increase in net worth plus nondeductible expenditures method. Findings of Fact Some of the facts have been, stipulated and are incorporated herein by this reference. Joe Wright and Lillian Wright were, prior to the death of Joe Wright on October 20, 1962, and during all the years involved herein, husband and wife residing in Camden, Tennessee. They filed joint income tax returns for the calendar years 1954, 1955, and 1956 with the district director of internal revenue at Nashville, Tennessee. Joe Wright was born in 1908. His home town was Camden, which at the time of the trial had a population of about 3,300 persons, and which had a population during the depression years of the 1930's of about 1,000. Prior to 1929 Wright engaged in various manual labor activities such as picking peas, cutting sprouts and digging ditches. In or around 1929 he acquired a 5 and 10 cent store in Camden which he operated at a profit in partnership with his brother for two or three years. At an undisclosed time he bought his brother's interest in such business for a price between $900 and $1,250. *260 He maintained a slot machine in the store from which he made a profit and also owned two other slot machines and a cigarette machine located elsewhere in the county. He sold the store business in 1944 for $1,640 and an old car. During the period 1929 to 1944 he also bought and sold a few cars and various other items. Wright was married in 1936. During the 1930's he and his wife kept only small amounts of money deposited in the bank. In 1944 Wright became ill and underwent an operation, and was hospitalized for 47 days. From that time through 1949 he was ill and unable to carry on any regular work. His principal source of income during that period was rental properties which he acquired during such period. He also had some income from trading cars. During that period he incurred numerous medical bills. In May of 1950 Wright organized the Wright Buick Company which he owned and operated as a sole proprietorship in Camden until the latter part of 1958. In connection with obtaining the Buick franchise he submitted a financial statement signed by him and dated January 25, 1950, to the Buick Motor Division of General Motors Corporation, in which he showed his total assets and net worth to *261 be $71,596.76. Therein it was stated that he had cash in hand and in banks of $11,226.76 and a number of items of real estate of a cash value of $57,800. No liabilities were shown. At that time he had cash in his bank account in the amount of $10,826.76. In 1950 he had a building erected for the Buick business at a cost of $16,300, which was paid in cash. The building was constructed on a lot which he had purchased in 1948 or 1949 for $1,000 cash. In 1950 he acquired, for the Buick business, machinery and equipment at a cost of $3,585.65, which was paid by cash or check. In 1951 he purchased for $2,700 in cash a lot adjoining the lot on which the Buick building was constructed. In 1951 and 1952 he purchased machinery and equipment for the Buick business at a total cost of $4,181.58. In 1952 he constructed an additional building for the Buick business at a cost of $2,614.70. In the latter part of 1954 Wright organized the Steppe Mercury Company which he operated in Camden until the latter part of 1956. This business was owned by him but was put in the name of one of his employees, Howard Steppe, in order not to lose his Buick franchise. In both of these businesses Wright sold both new *262 and used cars. He acted as general manager of these businesses and had 7 or 8 full time employees working for him most of the time, including a bookkeeper. Wright purchased many used cars at auctions, often paying for them in cash, which required that he have at times considerable sums of cash. Upon entering into the Buick business Wright's bookkeeper set up a system of bookkeeping which was prescribed by General Motors Corporation, using books furnished for that purpose. The method of accounting emploved was an accrual method. A general ledger was maintained for the year 1951 or 1952, but not for subsequent years. During the years in question there were kept for the Buick business various journals for recording cash receipts, cash disbursements, new car sales, used car sales, and purchases. Apparently similar records were kept for the Mercury business. Bank accounts were maintained for the Buick and Mercury businesses. The bookkeeper handled the banking transactions, depositing checks and proceeds from notes receivable in such accounts. At times Wright received property, other than cars, in trade for cars, and the receipt of such other property was not recorded on the business books. *263 When such other property was sold the selling price was registered by the bookkeeper on the cash register as a cash sale. Prior to the purchase of the building for the Mercury business, which occurred on October 2, 1954, Wright had sold junked or used automobiles, tractors, trucks, motor scooters, bicycles, generators, starters, and other items. As to at least a part of these sales Wright did not advise his bookkeeper, and as a consequence the proceeds were not recorder in the business records. In this manner Wright accumulated approximately $7,500 which he used in partial payment for the building he purchased for use in the Mercury business. In connection with the automobile businesses, notes received upon sales of cars were discounted at banks and various financial institutions, including General Motors Acceptance Corporation, Universal C.I.T. Credit Corporation, and Commercial Credit Corporation. The notes included the purchase price of the car, plus carrying charges, and insurance. The banks and finance companies withheld a portion of the amounts due dealers and placed them in dealer reserve accounts to cover contingent liabilities. The dealer was entitled from time to time to *264 withdraw portions of the reserve as the balance in the account exceeded a prescribed percentage of outstanding notes. The records maintained by Wright did not reflect the charges and credits to the various dealer reserve accounts maintained for him. In 1954 Wright received a dealer reserve check from Commerce Union Bank in the amount of $6,000 which he did not deposit in his business bank accounts. Instead he cashed the check and used the proceeds as part payment for the building for the Mercury business. In 1956 Wright received from Universal C.I.T. Credit Corporation two dealer reserve checks dated February 21, 1956, made payable to Wright Buick Company and Steppe Mercury Company, in the respective amounts of $1,000 and $3,000. These checks were cashed by Wright on March 2, 1956, and the proceeds were not deposited in his business bank accounts. In 1956 there was also issued to Wright Buick Company by Commerce Union Bank a dealer reserve check dated April 20, 1956, in the amount of $3,500. This check was endorsed and cashed by Wright's bookkeeper, but was not deposited in the business bank accounts. In 1954 Wright received from P. E. Thompson a check dated July 7, 1954, in the amount *265 of $1,800. This check represented, to the extent of $1,200, partial repayment of a loan of $12,000, and to the extent of $600, represented interest on the loan. This check was endorsed and cashed by Wright and the proceeds were not deposited in any of Wright's business bank accounts. Rather, the proceeds were used in partial payment for the building for the Mercury business. In 1955 Wright also received a check from Thompson dated July 6, 1955, in the amount of $1,740, of which $1,200 represented repayment of principal of the loan, and the remainder of $540 represented interest. The check was endorsed by Wright, but neither it nor the proceeds were deposited in his business bank accounts. In 1956 Wright received another check from Thompson dated July 5, 1956, in the amount of $1,680, of which $1,200 represented repayment of principal of the loan, and the remainder of $480 represented interest. This check was endorsed by Wright and his bookkeeper and was cashed. The proceeds were not deposited in any of Wright's business bank accounts. During the years in question Wright engaged the services of a certified public accountant to prepare his income tax returns. Such accountant did prepare *266 the returns on the basis of records kept by Wright's bookkeeper and information received from Wright and other sources when necessary. In the course of preparing the returns for each of the years 1954, 1955, and 1956 the accountant adjusted Wright's books to eliminate from sales of each of such years an amount of $1,800, on the erroneous premise that in each of those years Wright had received from Thompson a repayment in that amount of principal on the Thompson loan and had deposited such amounts in his business bank accounts and as a result had overstated sales for those years. This adjustment was made by the accountant on the basis of information received from Wright. Since the checks received by Wright from Thompson in each of the years 1954, 1955, and 1956 had not been deposited in his business bank accounts and had not been reflected on the books as a part of sales, the elimination of these amounts by the accountant resulted in the understatement of income for each of those years by the amount of $1,800. Likewise, since the checks were not reflected in the business bank accounts, the portions thereof representing interest were not reflected as income on the records and in the *267 returns for those years. The amounts of interest omitted for the years 1954, 1955, and 1956 were, respectively, $600, $540, and $480. Since Wright's books and records did not reflect the charges and credits to the various dealer reserve accounts, the accountant obtained from the banks and finance companies the year-end balances in Wright's dealer reserve accounts. In preparing the Wrights' returns the accountant reported income from dealer reserve accounts for both automobile businesses by accruing as income the excess of the balances at the end of each year over the balances at the beginning of the year. Such difference would not properly reflect income from dealer reserve sources unless an adjustment were made for any amounts withdrawn from such reserves by Wright during the taxable year. Recognizing this, the accountant made an adjustment for 1954 by reducing the opening balance of the dealer reserve account involved by the amount of $6,000 which Wright withdrew in that year. However, he did not make any such adjustments for the year 1956 on account of the 3 withdrawals, above referred to, made by Wright in the aggregate amount of $7,500. During the years 1953 to 1956, inclusive, *268 the Wrights derived taxable income from rentals and sales of real estate, dividends, interest, and other income-producing activities, in addition to income from the two automobile agencies. They did not receive any money or other property from gifts, or inheritance, or any other nontaxable sources, during those years. The Wrights did not file any income tax returns for the years 1940 to 1947, inclusive. For 1948 Wright filed an income tax return showing no tax liability. For 1949 he filed a return showing only net income from rentals of $2,549.48 and no tax due. For the years 1950 through 1953 the Wrights filed income tax returns, reporting as their only income, rentals and profits from the Buick business. The amount of net income or profits so reported (after adding back depreciation claimed) and the amount of income tax liability shown were as follows: Net Profit
Income Tax
from Buick
Liability
Year
Net Rentals
Business
Shown
1950
$2,242.38
$12,271.72
$1,882.70
1951
2,726.77
22,576.83
5,399.88
1952
1,216.24
21,843.18
4,918.02
1953
1,583.05
6,406.20
598.68
Total
$7,768.44
$63,097.93 The records of the Internal Revenue Service show that over the period from 1940 through 1949 no income taxes were paid by the *269 Wrights. During the years 1950 through 1953 income taxes and self-employment taxes and interest thereon were paid in the total amount of $12,794.85. For the taxable years in question, the Wrights filed joint income tax returns, reporting as their only income net rentals, net profits from the Buick business, and net profits from the Mercury business. The amounts thereof, the taxable income, and income tax liability shown on such returns were as follows: Net Profit
Net Profit
Net
from Buick
from Mercury
Taxable
Income Tax
Year
Rentals
Business
Business
Income
Liability
1954
$714.70
$10,073.86
$ 555.52
$ 7,944.08
$1,667.70
1955
157.45
914.11
12,916.36
10,587.92
2,352.86
1956
(694.50) *
14,104.71
1,341.74
11,352.25
2,551.59
In January of 1957 the Internal Revenue Service assigned a special agent to investigate the Wrights' income tax return for the year 1954. Later the investigation was broadened to cover the years 1953, 1955, and 1956. A revenue agent was assigned to the case in February 1958 and the two agents conducted the investigation jointly thereafter. During the course of the investigation the agents examined all Wright's records for the years 1954 through 1956 which were made available to them. These *270 included cash receipts journals, cash disbursements journals, new car sales journals, used car sales journals, some purchase journals (some of the purchase journals were missing for the years involved), and business bank statements, cancelled checks and check stubs. No general ledgers were available for the years in question. Some of the bank statements and deposit slips were missing, but the agents obtained transcripts of the bank records. Wright and his wife each maintained a personal bank account at the Commerce Union Bank, and the agents examined the records of such accounts. The agents interviewed Wright on numerous occasions during the course of the investigation, the first interview being on January 22, 1957. At times Wright was not well, and on some occasions was in the hospital, but they questioned him as closely as his condition would permit. They questioned him specifically about cash on hand and in his personal and business bank accounts, his various rental properties, his income from rental properties and the Buick and Mercury businesses, his dealings in junk cars and other items, his notes receivable, liabilities, dealer reserve checks, and his personal living expenses. *271 In addition, the agents examined records in the county courthouse to determine the property holdings and transactions of the Wrights. They also interviewed various persons with whom Wright had had financial dealings. The revenue agent compared the Wrights' income tax returns with their books and records and found that they did not correspond. He thereupon examined the work papers which had been prepared by the Wrights' accountant and found that the income as computed on the returns was arrived at by the use of a modified net worth or bank deposits method, taking into account only the business bank accounts, and that such accountant had made numerous adjusting entries to the books in order to arrive at the figures used in the returns. The revenue agent accordingly concluded that the Wrights' books and records were not accurate or adequate for the purpose of computing taxable income. He further determined that specific items of income had been omitted from the returns. Accordingly, the agents determined that it was necessary to compute the taxable income of the Wrights for the taxable years in question by the use of the net worth method. Based on the data and information collected by *272 the agents, the respondent in the notice of deficiency determined the taxable income of the Wrights for the taxable years 1954 through 1956 by the net worth method as follows: ASSETS
12-31-53
12-31-54
12-31-55
12-31-56
1. Cash: (a) On hand
$ 8,623.61
$ 7,810.36
None
$ 7,490.59
(b) Uncashed checks on hand or in transit
None
8,000.00
None
None
(c) In banks, reconciled
9,306.05
18,769.49
$ 6,253.45
25,254.15
2. Dealer's reserve accounts
17,593.39
9,118.11
17,586.87
13,924.45
3. Inventory - Wright Buick Company
11,453.98
7,659.67
7,129.67
8,750.36
4. Inventory - Steppe Mercury Company
None
3,714.91
3,839.54
None
5. Accounts receivable - Wright Buick Co.
(Business)
6,085.82
2,806.36
1,632.72
7,795.11
6. Accounts receivable - Steppe Mercury Co.
(Business)
None
34,71
3,635.09
None
7. Notes receivable - Wright Buick Co.
(Business)
2,991.65
3,178.63
3,110.17
1,679.79
8. Notes receivable - Steppe Mercury Co.
(Business)
None
None
None
None
9. Notes receivable - Not on business records
14,186.67
11,789.51
19,922.35
23,375.70
10. Finance contracts
None
853.76
None
None
11. Ford Motor Company stock
None
None
None
4,837.50
12. Discounts receivable - Wright Buick Co.
1,050.00
675.00
560.00
60.00
13. Prepaid expenses - Wright Buick Co.
193.85
193.85
193.85
193.85
14. Real Estate: (a) Rental property
$ 31,100.00
$ 31,100.00
$ 47,100.00
$ 47,100.00
(b) Wright Buick Company
22,614.70
22,614.70
22,614.70
22,614.70
(c) Steppe Mercury Company
None
17,915.32
17,915.32
17,915.32
(d) Acquired on trade
1,243.00
1,943.00
2,343.00
6,018.00
(e) Concrete blocks acquired on trade
None
None
None
650.00
(f) Personal residence
4,000.00
4,000.00
17,000.00
17,000.00
15. Machinery, equipment, furniture and fix-
tures: (a) Wright Buick Company
7,767.23
7,767.23
7,767.23
7,767.23
(b) Steppe Mercury Company
None
336.78
336.78
336.78
Total Assets
$138,209.95
$160,281.39
$178,940.74
$212,763.53
LIABILITIES
16. Accounts payable
$ 1,674.81
$ 808.17
$ 678.25
$ 473.13
17. Notes payable
None
1,127.26
None
None
18. Taxes payable, local
458.04
612.79
1,268.57
334.56
19. Reserve for depreciation
11,072.81
13,635.58
17,150.51
20,978.47
20. Reserve for bad debts
3,890.58
1,521.45
1,521.45
1,521.45
Total Liabilities
$ 17,096.24
$ 17,705.25
$ 20,618.78
$ 23,307.61
Net worth
$121,113.71
$142,576.14
$158,321.96
$189,455.92
Less: Net worth end of preceding year
121,113.71
142,576.14
158,321.96
Increase in net worth
$ 21,462.43
$ 15,745.82
$ 31,133.96
Plus: Personal living expenses
3,500.00
3,500.00
3,500.00
Federal income taxes paid
878.03
2,443.40
3,580.94
Total
$ 25,840.46
$ 21,689.22
$ 38,214.90
Less: Nontaxable portion of capital gains
None
150.00
None
Dividend exclusion
None
None
50.00
Total
None
$ 150.00
$ 50.00
Adjusted gross income as adjusted
$ 25,840.46
$ 21,539.22
$ 38,164.90
Deduct: Credit for exemptions
2,400.00
2,400.00
2,400.00
Standard deduction
1,000.00
1,000.00
1,000.00
Total
$ 3,400.00
$ 3,400.00
$ 3,400.00
Taxable income as adjusted
$ 22,440.46
$ 18,139.22
$ 34,764.90
Taxable income as disclosed by return
7,944.08
10,587.92
11,352.25
Increase in taxable income
$ 14,496.38
$ 7,551.30
$ 23,412.65
*273 All the items as determined by the respondent in the above computation were either stipulated or conceded as correct by the petitioners, except as specifically discussed hereinafter in the Findings of Fact or Opinion under the same characterization and item numbers as appear in the respondent's computation. 9. Notes receivable - not on business records The respondent in his net worth computation determined that Wright had notes receivable under this heading in the following amounts: 12-31-53
12-31-54
12-31-55
12-31-56
$14,186.67
$11,789.51
$19,922.35
$23,375.70 The notes outstanding at December 31, 1953, represent loans made by Wright during the year 1953. In addition to the notes receivable shown in the respondent's computation under this heading, Wright had the following notes receivable at the dates indicated: 12-31-53
12-31-54
12-31-55
12-31-56
$16,195
$11,350
$8,400
None Of these additional notes receivable on hand at December 31, 1953, the amount of $14,300 represents cash loans made by Wright to individuals in 1949 and 1950 prior to the commencement of the Buick business, and $1,100 represents cash loans made by him to individuals in 1950 after the commencement of the Buick business. 14. *274 Real Estate (a) Rental property The respondent included in the Wrights' net worth under this heading as of the end of each of the years 1953 and 1954 the amount of $31,100, and as of the end of each of the years 1955 and 1956 the amount of $47,100. The $31,100 was constant as of the end of each of the years 1953 through 1956 and represented the cost of such assets which Wright had paid for in cash or by checks between the years 1944 and 1949. These were the costs of such properties shown by the Wrights in their income tax return for 1950 and for the years in question. The increase of $16,000 in such assets shown by the respondent as of the end of each of the taxable years 1955 and 1956 is made up of amounts which the respondent determined to be the cost of a residence of the Wrights which was converted to rental use, a livestock barn, and another building acquired at the time the Wrights acquired a new residence. Additional property - It has been stipulated that in addition to the rental property included by the respondent in his computation, Wright had at December 31, 1953, 1954, 1955, and 1956 Lot No. 1, Camden, for which he had paid $3,500 in cash on February 14, 1945; and Mule *275 Barn Road property which he had purchased by check for $1,000 on March 12, 1949; and that on December 31, 1955 and December 31, 1956, he had Noble Tharpe property which he purchased for $100 on May 19, 1956. Livestock barn - The $47,100 which the respondent set forth in his net worth computation as representing taxable property on hand at the end of the taxable years 1955 and 1956 included a livestock barn at a cost of $9,000. Wright purchased this barn from Farmers Livestock Market of Camden, Inc., by deed dated October 22, 1955, made out to the Wrights' two minor children. The deed recited a consideration of $8,000 and bore Federal documentary stamps in the amount of $8.80. The deed was prepared by an attorney and was signed by William F. Massey, president of the Market. The Farmers Livestock Market had purchased this property on March 29, 1954, for a consideration of $8,000. In its income tax return of the calendar year 1955, the Market reported a long-term capital gain on the sale of the property to Wright, reporting a gross sales price of $9,000, and expense of sale as zero. The cost of the livestock barn to Wright was $9,000, paid by cash. (c) Steppe Mercury Company By deed *276 dated October 2, 1954, O. D. Nolen and Ora Mae Nolen deeded to Mrs. Lillian Wright property described as certain lots and a brick building, referred to herein as the Steppe Mercury Company property. Also transferred with such property, although not enumerated in the deed, was equipment which had been used by Nolen in an automobile business which he had conducted on the premises. The deed recited a consideration of $7,500 and bore Federal documentary stamps totaling $8.25. An attorney prepared the deed from information acquired from the parties. The transaction was consummated on Saturday afternoon, October 2, 1954. On Monday, October 4, 1954, there was deposited by Nolen or his wife in the Commerce Union Bank, to the credit of Mrs. O. D. Nolen, $15,000 in currency. In their income tax return for the calendar year 1954, the Nolens reported a long-term capital gain of $3,621.96 on this sale. The computation showed the cost of the property and improvements as $27,062.19, depreciation allowed or allowable in the amount of $15,684.15, gross sales price of $15,000, and expense of sale as zero. In such return they reported substantial business losses and no tax due. Wright paid Nolen $15,000 *277 for the property, consisting of fifteen $1,000 bills. As hereinbefore stated, Wright obtained the cash so paid from three sources, namely, $7,500 received from sale of junked or used autos, tractors, etc., $6,000 of proceeds of a dealer reserve check, and $1,800 of proceeds of a Thompson check. The parties are in agreement that during 1954 Wright made improvements to this property totaling $2,915.32. (d) Acquired on trade Included in the amount of $6,018 shown by the respondent in his net worth computation as of December 31, 1956, is an item of $550 representing certain property for which Wright's bookkeeper issued a check in the amount of $550, dated December 24, 1956, drawn on the Wright Buick Company, in favor of Lindle Watson and Irene Watson. This property was purchased by Wright and 4 other individuals, Wright owning a one-fifth interest. The other individuals repaid Wright their share of the purchase price of $550. (f) Personal residence The Wrights acquired their present personal residence, which is a 3-bedroom brick house, along with another small frame house and the lot on which both houses were located, from Clifford G. Ingram and Myrtle H. Ingram by deed dated April 29, *278 1955. The deed was made out to the Wrights' twin children, recited a consideration of $10,000 and bore Federal documentary stamps totaling $11.00, cancelled by the initials of Ingram. The parties are agreed that the portion of the cost allocable to the small house is $3,000, and that amount has been included by the respondent as cost of rental property, since the Wrights converted it to rental use. The deed to this property was prepared by an attorney from the Ingram's previous deed and from information furnished by the parties. At the time of consummation of the transaction Wright gave the Ingrams a check dated April 29, 1955, in the amount of $10,000, drawn on Wright Buick Company and signed by his bookkeeper. The Ingrams had acquired the lot and the small frame house by purchase in December of 1953. Shortly thereafter they built the large residence on the property, moving into it in March 1954. In their joint income tax return for the calendar year 1955, the Ingrams reported a long-term capital gain of $3,020.63 from the sale of this property to the Wrights, showing the gross sales price as $20,000, the depreciation allowed or allowable on the small house as $180.32, cost of the *279 small house as $2,909.69, cost of the large house as $10,000, cost of the lot as $4,250, and expense of sale as zero. The return showed, after deductions and exemptions, no taxable income and no tax due. In addition to the $10,000 check above referred to, Wright also paid the Ingrams $10,000 in cash as consideration for the properties, or a total consideration of $20,000, of which $17,000 was paid for the large personal residence and lot. 19. Reserve for depreciation For each of the taxable years 1954, 1955, and 1956 the petitioners are entitled to a depreciation allowance, in addition to that allowed by the respondent in his net worth computation, in the amount of $500 on account of the Johnson garage, gas station equipment on Lot No. 1, a small storage building, and a gas station on West End. Personal Living Expenses During the years in question Wright was married and lived with his wife and twin children, Joe Edward Wright and Judy Angelene Wright, who were born on September 8, 1941. During these years the Wrights lived conservatively. The two children did not attend private schools. Until April 1955, the Wrights lived in a $4,000 frame house when they moved to their present residence *280 which was purchased from the Ingrams for $17,000. Lillian Wright handled the personal living expenses for the family and during the years in question she used about $200 of rental income each month to pay for the household and family living expenses, except Wright's medical expenses, his meals not eaten at home, his clothing, and his other expenditures for cigarettes, etc. The Wrights' living and personal expenses were $3,000 in each of the years 1954, and 1955, and $3,500 in 1956. 1. Cash (a) On Hand At the first interview which the special agent had with Wright during the investigation, on January 22, 1957, the agent discussed Wright's bank accounts and cash on hand, and asked him whether he dealt principally by cash or check. Wright told the agent that he dealt mostly by checks, and that he did not keep large sums of money on hand, either on his person, at his place of business or at his residence, although at one time he carried large sums to auctions to purchase cars. Thereafter other interviews were had with Wright in 1957 and 1958. At an interview on September 25, 1958, Wright for the first time told the agents that he had a cash hoard which he kept under his house, of which *281 only he was aware, of $33,450. The agents asked him when he last had this amount and he replied that he did not know. They also asked him to give the amount of cash which he had on hand at the end of a number of years and he stated that he did not know and had not kept a record, but that at the time of the interview he had approximately $300 to $400 on hand in currency. On October 31, 1958, Wright stated under oath to the Intelligence Division of the Internal Revenue Service that he did not keep a record of how his cash hoard was used. The respondent's determination of cash on hand as of the beginning of 1954 and as of the end of that year and each of the other years in question was based upon a computation made by the revenue agent. The agent computed the cash on hand by a "cash flow" method. Such computation started with the total cash on hand and in banks as of January 25, 1950, in the amount of $11,226.76, as shown on the financial statement furnished by Wright to the General Motors Corporation. From this figure there was subtracted the amount in Wright's bank account at that time, namely, $10,826.76, leaving cash on hand in the amount of $400. The agent then listed all Wright's *282 cash receipts and disbursements from that time until the end of 1956 which he could determine. Disbursements for living expenses were estimated at $3,500 per year. On several dates in that period the agent's computation showed a deficit balance of cash on hand, indicating that according to the calculation Wright had spent more cash than the agent could find was available to him. In such instances the agent did not carry the deficit figure forward, but carried forward a balance of zero. Such deficits were encountered in each of the years 1952, 1954, 1955, and 1956, amounting, respectively, to $15,474.11, $3,722.56, $13,932.98, and $1,238.33. By this method the agent calculated, and the respondent determined, cash on hand as follows: 12-31-53
12-31-54
12-31-55
12-31-56
$8,623.61
$7,810.36
0
$7,490.59
The Wrights had cash on hand in the amounts determined by the respondent except that at December 31, 1955, they had $5,000 in cash. Revised Net Worth Computation Giving effect to the foregoing, the revised net worth computation, showing the Wrights' correct taxable income for the taxable years 1954, 1955, and 1956, is as follows: ASSETS
12-31-53
12-31-54
12-31-55
12-31-56
1. Cash: (a) On hand
$ 8,623.61
$ 7,810.36
$ 5,000.00
$ 7,490.59
(b) Uncashed checks on hand or in transit
None
8,000.00
None
None
(c) In Banks, reconciled
9,306.05
18,769.49
6,253.45
25,254.15
2. Dealer's reserve accounts
17,593.39
9,118.11
17,586.87
13,924.45
3. Inventory-Wright Buick Company
11,453.98
7,659.67
7,129.67
8,750.36
4. Inventory-Steppe Mercury Company
None
3,714.91
3,839.54
None
5. Accounts receivable - Wright Buick Co.
(Business)
6,085.82
2,806.36
1,632.72
7,795.11
6. Accounts receivable - Steppe Mercury Co.
(Business)
None
34.71
3,635.09
None
7. Notes receivable - Wright Buick Co.
(Business)
2,991.65
3,178.63
3,110.17
1,679.79
8. Notes receivable - Steppe Mercury Co.
(Business)
None
None
None
None
9. Notes receivable - Not on business records
30,381.67
23,139.51
28,322.35
23,375.70
10. Finance contracts
None
853.76
None
None
11. Ford Motor Company stock
None
None
None
4,837.50
12. Discounts receivable - Wright Buick Co.
1,050.00
675.00
560.00
60.00
13. Prepaid expenses - Wright Buick Co.
193.85
193.85
193.85
193.85
14. Real Estate: (a) Rental property
35,600.00
35,600.00
51,700.00
51,700.00
(b) Wright Buick Company
22,614.70
22,614.70
22,614.70
22,614.70
(c) Steppe Mercury Company
None
17,915.32
17,915.32
17,915.32
(d) Acquired on trade
1,243.00
1,943.00
2,343.00
5,578.00
(e) Concrete blocks acquired on trade
None
None
None
650.00
(f) Personal residence
4,000.00
4,000.00
17,000.00
17,000.00
15. Machinery, equipment, furniture and fix-
tures: (a) Wright Buick Company
7,767.23
7,767.23
7,767.23
7,767.23
(b) Steppe Mercury Company
None
336.78
336.78
336.78
Total Assets
$158,904.95
$176,131.39
$196,940.74
$216,923.53
LIABILITIES
16. Accounts payable
$ 1,674.81
$ 808.17
$ 678.25
$ 473.13
17. Notes payable
None
1,127.26
None
None
18. Taxes payable, local
458.04
612.79
1,268.57
334.56
19. Reserve for depreciation
11,072.81
14,135.58
18,150.51
22,478.47
20. Reserve for bad debts
3,890.58
1,521.45
1,521.45
1,521.45
Total Liabilities
$ 17,096.24
$ 18,205.25
$ 21,618.78
$ 24,807.61
Net Worth
$141,808.71
$157,926.14
$175,321.96
$192,115.92
Less: Net worth end of preceding year
141,808.71
157,926.14
175,321.96
Increase in Net Worth
$ 16,117.43
$ 17,395.82
$ 16,793.96
Plus: Personal living expenses
3,000.00
3,000.00
3,500.00
Federal income taxes paid
878.03
2,443.40
3,580.94
Total
$ 19,995.46
$ 22,839.22
$ 23,874.90
Less: Nontaxable portion of capital gains
None
150.00
None
Dividend exclusion
None
None
50.00
Adjusted gross income as adjusted
$ 19,995.46
$ 22,689.22
$ 23,824.90
Deduct: Credit for exemptions
2,400.00
2,400.00
2,400.00
Standard deduction
1,000.00
1,000.00
1,000.00
Taxable income
$ 16,595.46
$ 19,289.22
$ 20,424.90
*283 Opinion The petitioners contend that the respondent was in error in determining the deficiencies against them. The burden is upon them to show that his determination is invalid or erroneous. Helvering v. Taylor, 293 U.S. 507, 515; Thomas v. Commissioner, (C.A. 6) 223 F. 2d 83; Carmack v. Commissioner, (C.A. 5), 183 F. 2d 1; Hoefle v. Commissioner, (C.A. 6), 114 F. 2d 713; Joseph v. Moriarty, 18 T.C. 327, affd. per curiam (C.A.D.C.), 208 F. 2d 43; and Rule 32 of the Rules of Practice of this Court. The petitioners first maintain that the Wrights kept adequate books and records, employing a bookkeeper for that purpose; that the Wrights' joint income tax returns were prepared from such books and records by a certified public accountant; and that, therefore, the respondent was not justified in computing taxable income by the net worth method. The petitioners did not offer in evidence any of Wright's books and records. The respondent determined that the books and records were not adequate, the revenue agent testifying that several of the automobile business books were missing. The Wrights' own accountant in preparing their returns found it necessary to make a number of adjusting *284 entries on the automobile business books to properly reflect the income which he computed by a type of net worth method. He also had to obtain information from the Wrights as to some of their other business transactions. The evidence shows that the books did not reflect all business transactions. For example, the books of the automobile business did not reflect property, other than cars, which was received in trade for cars, and sometimes when Wright sold junked or used automobiles and other items, he did not have the proceeds recorded on the business books. In addition, Wright made certain withdrawals from dealer reserve accounts which were not recorded on the business records. Nor is there evidence to show that the Wrights maintained adequate records of their other business transactions, such as the receipt of rentals and interest on non-business loans. On this record we must conclude that the petitioners have not shown that the Wrights kept adequate books and records from which their taxable income could be accurately computed. In any event, it is well established that the net worth method may be used even though a taxpayer maintains a set of books; that such method may be used *285 to test the accuracy of the books and the returns; and that when properly employed, such method may show that the books are not trustworthy. Holland v. United States, 348 U.S. 121; Thomas v. Commissioner, supra; Morris Lipsitz, 21 T.C. 917, affd. (C.A. 4), 220 F. 2d 871, certiorari denied 350 U.S. 845; Harry Gleis 24 T.C. 941, affd. (C.A. 6), 245 F. 2d 237; and H. A. Hurley, 22 T.C. 1256, affd. (C.A. 6), 233 F. 2d 177. The net worth computation, as revised, shows substantial amounts of taxable income over and above the amounts reported by the Wrights in their returns for the years in question, specifically $8,651.38, $8,701.30, and $9,072.65, respectively, for those years. It may be added that the record shows that the revenue agents were diligent in their investigation, examining bank records and county land records, and interviewing persons with whom Wright had financial dealings, and there is no showing that Wright gave them any leads which they failed to follow up. Further, it has been stipulated that during the taxable years the Wrights did not receive any money or other property from gifts or inheritances or any other non-taxable sources. See United States v. Massei, 355 U.S. 595. *286 Accordingly, we see no merit to the contention that the respondent was in error in determining the Wrights' taxable income by the net worth method. We have carefully considered each of the items as to which the petitioners contend the respondent was in error and have made certain corrections in the respondent's net worth computation. [1] Each of these items is discussed hereinafter. 9. Notes receivable - not on business records At the hearing the petitioners introduced evidence to show that, in addition to *287 the amount of notes receivable allowed under this category by the respondent, at the beginning of the taxable year 1954 Wright had 18 notes receivable in the amount of $16,195. Sixteen of the notes were introduced into evidence. The evidence establishes that the remaining two notes, aggregating $150, were paid during the taxable year 1956. The 16 notes which are in evidence contain notations indicating the dates of payment. The respondent on brief admits that Wright had additional notes receivable outstanding at January 1, 1954, in the amount of $16,195, and has revised his net worth computation to show in petitioners' opening net worth under this heading notes receivable in the amount of $30,381.67. The respondent contends that, except for one note, [2] *288 we should not accept as correct the dates of payment shown on such notes, and that we should conclude that the outstanding amounts on such notes remained the same at the end of each of the taxable years in question. Thus, the respondent contends that, with the one exception noted, these additional notes would not affect the increase in the petitioners' net worth for any of the years involved. The makers of 6 of the notes were presented as witnesses by the parties and upon the basis of their testimony the respondent makes the contention that it is improbable that the notes were repaid as indicated on the notes. We have carefully examined the testimony of these' witnesses and, while there were some inconsistencies in the testimony, we cannot conclude that their testimony justifies the conclusion, as contended by the respondent, that any of the notes remained outstanding in their full amounts throughout the taxable years involved. Some of their testimony might tend to indicate that installment payments had been made on some of the notes prior to January 1, 1954, but, as stated, the respondent on brief concedes that the Wrights' opening net worth should properly reflect the full amount of $16,195. Both Wright and his bookkeeper testified that to the best of their knowledge repayments on these notes were received as indicated thereon. Under the circumstances we have accepted as correct the dates of payment indicated on the notes. 14. Real Estate (a) *289 Rental property Additional Property - By amendment to their petition the petitioners alleged that there had been omitted by the respondent from their assets 7 pieces of rental property. As pointed out in the Findings of Fact, the parties are in agreement that at December 31, 1953, 1954, 1955, and 1956 there should be included among such properties, in addition to those included by the respondent in his original computation, 2 properties, namely, Lot No. 1, Camden, and Mule Barn Road property at an aggregate cost of $4,500, and that at December 31, 1955 and 1956 there should be included the Noble Tharpe property at a cost of $100. The petitioners contend that the remaining 4 properties should be included as of December 31, 1953, 1954, 1955, and 1956, namely, the Johnson garage at a cost of $6,758, gas station and equipment at a cost of $4,738, small storage building at a cost of $723, and Rushing Lot at a cost of $500. Wright testified that in 1948 he built, on a portion of Lot No. 1 above referred to, the Johnson garage at a cost of $6,758, paying for most of the materials by cash; that when he bought Lot No. 1 there was a gas station building located thereon and that in 1946 he spent *290 $4,738 by cash or check for equipment for the gas station, such as tanks, air compressors and other equipment, and for stocking the station; that in 1947 he built a small storage building at a cost of $723; and that about 1939 he purchased an unimproved lot known as the Rushing Lot for $500 in cash. Wright further testified that none of the above properties was ever encumbered by a mortgage, that he continued to own them throughout the years in question, and that none of them was included by the respondent in his net worth computation. The only evidence with respect to the above properties is Wright's testimony. However, there is no evidence to indicate that Wright did not own these various additional properties, and we have no reason to conclude that he did not. The only evidence of the original cost of the assets was Wright's testimony, unsupported by documentary evidence or otherwise. He testified that he had kept a ledger, starting in 1945, in which were included all his properties and their costs, but that such ledger was missing. The amount of $4,738 which Wright said he spent in connection with the gas station on Lot No. 1 was for equipment and stocking the station. Under the *291 circumstances, we cannot find with exactitude the amount of the original cost of the assets for purposes of inclusion in the assets listed in the net worth computation. In any event, whatever figures might be included in the net worth computation as costs of these assets would remain constant throughout the entire period and would not result in either an increase or a decrease in the net worth of the Wrights for any of the years in question. Accordingly, we have not included any amount in our revised net worth statement on account of these assets. The question of depreciation of some of these properties is discussed infra in connection with the reserve for depreciation. Livestock Barn - The petitioners contend that the cost of the livestock barn was $8,000 and that the respondent erred in including it in the net worth statement (as a part of the $47,100 at the end of each of the taxable years 1955 and 1956) at a cost of $9,000. The deed to the property recites a consideration of $8,000 and bears Federal documentary stamps totaling $8.80, the proper amount for a consideration of $8,000. [3] Wright testified that he paid Massey, president of the Farmers Livestock Market of Camden, Inc., *292 $8,000 in cash for the property. At one point, however, he testified that he paid Massey $2,500 and then later paid him $5,000. In depreciation schedules in his returns for the taxable years 1955 and 1956, Wright showed a cattle barn at a cost of $7,500, purchased in September 1955. Massey testified that the livestock barn was sold to Wright for $9,000 and that Wright paid him that amount in cash. The deed was prepared by an attorney from information obtained from one or the other of the parties. Massey's testimony was to the effect that he had not told the attorney that the selling price was $8,000. He further stated that he did not remember purchasing the documentary stamps; and this would seem to be borne out by the fact that in its income tax return *293 for the year 1955, the Farmers Livestock Market, in reporting capital gain on this sale, claimed no expense of sale. In such return the selling price of the barn was shown as $9,000. While the recitation in the deed and the amount of the documentary stamps affixed are evidence of the consideration, we think that here they are not decisive. Upon all the evidence, we have concluded and have found as a fact that the purchase price was $9,000. Accordingly we approve the respondent's inclusion of the livestock barn in his net worth computation at a cost of $9,000. [4] *294 (c) Steppe Mercury Co. The property referred to as the Steppe Mercury Company property was included by the respondent among the Wrights' assets as of the end of each of the years 1954, 1955, and 1956 at a cost of $17,915.32. This figure includes an amount of $15,000 which the respondent determined to have been the amount paid by Wright in October 1954 to the Nolens for this property, plus the amount of $2,915.32 which the parties agree represented the cost of improvements thereto made by Wright in 1954. The petitioners claim that this figure should be reduced by $7,500, claiming that Wright paid only $7,500 to the Nolens for the property. Wright testified that he paid Nolen $7,500 in cash for the property. Nolen, on the other hand, testified that Wright paid him $15,000 in $1,000 bills for the property. Wright's testimony finds some support from the fact that the deed recites a consideration of $7,500 and bears Federal documentary stamps totaling $8.25, the proper amount for *295 a consideration of $7,500. Nolen testified in effect that he did not advise the attorney to insert a consideration of $7,500; that that amount was inserted at the instance of Wright, and that the amount which should have been stated was $15,000. The testimony of the Wrights, on the one hand, and Nolen, on the other, is at variance in other respects, including where the transaction took place and whether or not there was a proffer of payment by check which was refused by Nolen. [5]
Nolen testified that the property which was transferred to Wright consisted of land and a building which had originally cost him about $7,500 in 1944, an addition to the building which he later *296 made, and a complete shop, including tools and equipment. In his return for 1954 Nolen showed the cost to him of all this property as being $27,062.19 (consisting of cost of original building, $8,100; cost of the addition, about $7,500; and cost of tools, equipment, etc., about $11,400.) He further testified that in negotiating with Wright he had started out by asking $17,500 or more, but that he had reduced his price to $15,000, attributing about $12,500 as value of land and buildings and $2,500 as value of the equipment. In his return he reported a capital gain on the sale, based upon a selling price of $15,000. Nolen's testimony that he received $15,000 for the property is strongly supported by the fact, clearly established by the evidence, that on Monday, following the Saturday on which the transaction occurred, there was deposited by him or his wife in the bank, to the credit of Mrs. O. D. Nolen, currency in the amount of $15,000. Based upon all the evidence, we have concluded and have found as a fact that the cost of the Steppe Mercury Company property to the Wrights was $15,000. We accordingly approve the respondent's determination in this respect. (d) Acquired on trade The *297 parties are in agreement as to all figures used by the respondent in his net worth computation under this heading except that used as of December 31, 1956. With respect to that figure the petitioners contend that property of a cost of $550 included therein should have been included at only $110, since Wright owned and paid for only a one-fifth interest in such property. We are satisfied from Wright's testimony and the notations on the check given in payment therefor that Wright owned a one-fifth interest in such property, and that, although he initially paid the full purchase price of $550, $440 was repaid to him by the other individuals who were co-owners. Accordingly, in our revised net worth computation we have reduced the amount under this heading as of December 31, 1956, to $5,578. (f) Personal residence The only item in dispute under this heading is the amount of $17,000 which the respondent included as of the end of each of the taxable years 1955 and 1956 as representing the cost of the Wrights' personal residence. By deed of April 29, 1955, the Wrights acquired from the Ingrams property consisting of a small frame house, the residence and the lot on which both are located. *298 The dispute arises as to how much was paid by the Wrights for this property. The parties are agreed that $3,000 was paid for the small frame house alone, and that amount has been included in the net worth computation under the category of rental property. The petitioners contend that they paid the Ingrams only $10,000 for the entire property, and of this amount $7,000 was paid for the residence and lot. The respondent has determined and contends that the total purchase price paid for this property by the Wrights was $20,000, of which $17,000 was for the residence and lot. The deed recites a consideration for the whole property of $10,000 and bears Federal documentary stamps of $11.00, the proper amount for a consideration of $10,000. Wright testified that he gave a consideration of $10,000 for the property, and that this amount was paid for by a check, which was placed in evidence. However, Mrs. Ingram, who was present when the transaction was consummated, testified that in addition to the check, Wright paid her and her husband $10,000 in cash for the property. Consistently, she and her husband in their income tax return for the year 1955 reported a gain upon the sale of this property *299 based upon a selling price of $20,000. In such return it was represented that all this property had cost them $17,159.69, of which $2,909.69 was the cost of the small frame house, $10,000 was the cost of building the large residence, and $4,250 was the cost of the land. Mrs. Ingram, in effect, testified that the return correctly reflected the cost. She further testified that neither she nor her husband had represented to the attorney that the selling price of the property to the Wrights was $10,000. Ingram did not testify. He had suffered a stroke and a heart attack, and therefore we draw no inferences from the respondent's failure to call him as a witness or to take his deposition. The attorney who prepared the deed and delivered it at the time of the consummation of the transaction testified that at that time he saw the check for $10,000, but that he did not see any currency transferred. He also testified, however, that he left immediately after delivering the deed to the parties and that he did not know whether or not cash was transferred. Three other witnesses for the petitioners testified that they were in Wright's Buick building at the time the transaction was closed and saw *300 the check, but did not see any cash change hands. One of these witnesses also testified that he had been instrumental in getting Wright and Ingram together for the purpose of negotiating the sale, and that at one time Ingram's asking price was $15,000 or $16,000, and that Wright made a counter offer of $10,000. The petitioners also, apparently for the purpose of showing that it was unlikely that they paid $20,000 for the property, introduced as witnesses two real estate men. One of them in effect testified that the value of the property at the time of the transaction, not including the small frame house, was no more than $8,000 or $9,000. He had not made an actual appraisal of the property. He described the small frame house as "a very cheap home." The other real estate witness testified that he did not think the property, including some improvements made by Wright but excluding the small house, was worth more than $10,000 at the time of the trial. He also stated that real estate values in the Camden area had not risen much since 1955. This testimony, however, must be discounted in view of the representation of the Ingrams that the cost of construction of the residence (approximately *301 a year before the sale in question) was $10,000, and that the cost of the land (about 16 months prior to the sale) was $4,250. Based upon observation at the trial the Court is of the opinion that Mrs. Ingram was a truthful witness. No reason has been shown why the Ingrams would have reported $20,000 in their income tax return as the selling price of this property if the selling price had been less. Furthermore, this is the third transaction we have considered herein in which persons who sold property to the Wrights testified to a higher price received by them than the Wrights claim they paid. The conclusion is inescapable that for some reason the Wrights desired to have the cost of their properties understated. Based upon a consideration of all the evidence, we have concluded and have found as a fact that the cost of this property to the Wrights, exclusive of the small frame house, was $17,000. Accordingly, we have not disturbed the respondent's determination in this respect. 19. Reserve for depreciation In view of the petitioners' contention that the respondent overstated in his net worth computation the cost of the Steppe Mercury building and the livestock barn, they state on brief *302 that the respondent's allowance for depreciation on such properties should properly be reduced. However, since we have sustained the respondent's determination of the cost of these properties, no adjustment of the respondent's depreciation reserve is required with respect thereto. The petitioners contend that the respondent's depreciation reserve as of the end of each of the taxable years 1954, 1955, and 1956 should be increased to reflect depreciation of about $900 (a rate of 4%) sustained on 4 additional properties, namely, the Johnson garage, a gas station and equipment on Lot No. 1, a small storage building, and a gas station on West End. The first 3 of these properties have been referred to hereinabove under item 14 relating to additional rental property. As previously stated, Wright testified that the Johnson garage was built on Lot No. 1, Camden, in 1948 at a cost of $6,758; that in 1946 he spent $4,738 for equipment for a gas station which was existing on such Lot No. 1 when he purchased it and for stocking such station; and that in 1947 he built a small storage building at a cost of $723. He further testified that in 1949 he built, on the lot on which he later built the Buick *303 building, a gas station, referred to as gas station on West End, at a cost somewhat in excess of $10,000, paying for it by cash or check. Wright testified that he had never claimed depreciation on any of these properties. It also appears that the respondent did not, in his net worth computation, allow depreciation on any of them. The burden of proof is, of course, upon the petitioners to establish the amounts of deductions to which they are entitled. Burnet v. Houston, 283 U.S. 223; Welch v. Helvering, 290 U.S. 111; and New Colonial Ice Co. v. Helvering, 292 U.S. 435. The elements which must be shown in order to properly compute a reasonable allowance for depreciation under section 167 of the 1954 Code are the adjusted basis of the property (cost adjusted by depreciation previously allowed, but not less than the amount allowable, see sections 167(g), 1011, 1012, and 1016(a)(2) of the Code), its estimated remaining useful life to the taxpayer, and the estimated salvage value as of the end of the estimated useful life. See sections 1.167(a)-1 and 1.167(b)-1 of the Income Tax Regulations.
Wright's testimony as to the original cost of these properties to him was not supported by any *304 documentary evidence or otherwise. With respect to the gas station and equipment on Lot No. 1, Wright's testimony is to the effect that the amount spent was partly for equipment and partly for stocking the gas station. Amounts expended for stocking the station would, of course, not represent the cost of depreciable assets. Under those circumstances any finding of the amount of original cost of additional depreciable assets would be merely an estimate. Furthermore, the only evidence directed toward establishing the remaining useful lives of the properties was Wright's testimony that most of the buildings were expected to last about 20 years. No evidence was presented as to the type of construction of the buildings, the physical condition of the properties in the years in question, or as to the estimated salvage value of any of them at the end of their useful lives. Thus, on this record we cannot accurately calculate the amount of depreciation to which the petitioners are entitled with respect to these 4 additional properties. However, since we have no reason to believe that Wright did not own these properties as he testified, and since we believe that he was entitled to some amount *305 as depreciation with respect thereto, we think it incumbent upon us to allow some amount in order that the net worth computation may reflect as nearly as possible his correct taxable income for the years in question. Accordingly, applying the principles of Cohan v. Commissioner, (C.A. 2), 39 F.2d 540, and bearing heavily against the petitioners whose inexactitude is of their own making, we, in the exercise of our best judgment, have concluded and found as a fact that for each of the years in question the petitioners are entitled to depreciation deductions on account of these particular properties in the aggregate amount of $500. To accomplish this result, in our revised net worth computation we have increased the respondent's reserve for depreciation as of the end of 1954 and the beginning of 1955 by $500, as of the end of 1955 and the beginning of 1956 by $1,000, and as of the end of 1956 by $1,500. Mathematically, these adjustments have no other effect than to accomplish a reduction of taxable income for each of the years in question by $500. Personal living expenses The petitioners contend that the Wrights' personal and living expenses were no more than $2,500 per year for each *306 of the years in question, while the respondent contends that the petitioners have not shown that $3,500 per year, as determined by him, is excessive. The record indicates that the Wrights lived modestly during the years in question. Their family consisted of two adults and twin children aged 13 to 15 during the years in question. Lillian Wright spent about $200 of rental income per month for the household and family expenses, other than the cost of Wright's clothing, meals not consumed at home, medical expenses, and his other expenditures for cigarettes, etc. Even though Wright lived modestly, we cannot escape the conclusion that he must have spent at least $600 per year for such items. In 1956 he became ill and spent large amounts for doctor and clinic or hospital bills. Using our best judgment based on the available evidence we have concluded and have found as a fact that the Wrights' personal and living expenses amounted to $3,000 in each of the years 1954 and 1955, and $3,500 in 1956. These amounts have been included in our revised net worth computation. 1(a). Cash on hand We have taken up last the consideration of cash on hand because other matters discussed hereinabove are pertinent *307 in such consideration. The respondent determined that the Wrights had cash on hand at the end of each of the years 1953 through 1956 in the respective amounts of $8,623.61, $7,810.36, zero, and $7,490.59. The petitioners contend that there was cash on hand on those dates in the respective amounts of $31,777.50, $31,077.50, $28,337.50, and zero. The burden of proof is upon the petitioners to show that the respondent's determination was incorrect. Wright testified that from his boyhood until about 1929 he picked peas, cut sprouts, dug ditches and performed other manual labor jobs, turning over about one-half of his earnings to his mother, who kept the money for him in a metal box under her bed; that between 1930 and 1944 he earned additional money from a 5 and 10 cent store business in Camden, from several slot machines and a cigarette machine maintained by him in the county, and from the trading of cars, some of which money he turned over to his mother prior to her death; that at the time of his marriage in 1936 he had accumulated quite a bit of cash in addition to the money kept by his mother; that shortly before his mother's death in 1937 or 1938 she turned over to him all of the *308 money kept by her for him; that he counted this money, which amounted to $33,450; that he put it in a bigger metal box and buried it under the chimney of his residence; that he did not spend any of such money until the 1950's; that in 1944 he had "quite a bit" of money, "maybe" $85,000 or $90,000, including the secret hoard; that from 1944 through 1949 he was seriously ill, being hospitalized 47 days in 1944, and was not able to work; that his only income during that period was from rental properties acquired in that period and from some trading of cars; that he began spending the secret hoard in 1951 or 1952; that at January 1, 1953, he had more than $31,000 of the cash hoard remaining; that between 1953 and 1956 he kept his cash in a metal box in his desk in his office in the Buick building; that he spent all of the hoard between 1953 and the end of 1956; and that at December 31, 1956, he had no cash. He testified, from a paper which he said he had copied eight weeks before the trial from an original record started in the beginning of 1953 or 1954, that he exhausted the cash hoard by using $33,077.50 in cash as follows: in 1954, $700 for purchase of car; in 1955, $600 for purchase *309 of two pieces of property, $4,140 as investment in the Buick and Mercury businesses; and in 1956, $4,837.50 for purchase of 75 shares of Ford Motor Company stock, $7,500 as a loan to Ben MacDonald, [6] and $15,300 as investment in the Buick and Mercury businesses. The petitioners also introduced several witnesses who testified that they either counted or saw large sums of money belonging to Wright. Some of them testified to having counted or having seen counted $31,000 at various, but not specific, times in 1953, 1954, 1955 or early 1956. One of them stated that Wright put this money in a metal box in the drawer of his desk. Wright, his son and daughter, and the bookkeeper testified to having -counted $20,000 in the Buick business office. The bookkeeper could not recall when this was, but the *310 children testified that it was between March and May 1956. Another witness stated that he was at the place of business in the spring of 1956 and witnessed this counting. Another witness testified that he witnessed this counting, but placed the time of the counting at some time within a year after the latter part of 1955 or the early part of 1956. The children testified that the money was kept in a box in Wright's business desk. The bookkeeper stated that she did not know whether Wright kept any money in his desk, but that she thought he kept it on his person. One witness stated that he and Wright counted $20,000 in the first part of 1956; another stated that he and Wright together counted $20,000 about October or November 1956, and that Wright put this money in a metal box in the drawer of his desk. Another witness testified that he had seen large sums of money in a metal box at Wright's place of business and on his person every year, both before and after 1956. Another stated that he had seen Wright carrying large sums of money, and that the largest amount he ever saw Wright count was about $9,000. We are satisfied that Wright at times throughout the years in question did have large *311 sums of money in a metal box at his place of business, and that at times he also carried large sums of money on his person. However, none of the witnesses, except Wright, testified that the cash seen or counted represented a cash hoard which Wright had maintained through the years. The money which was counted or seen at the Buick office, which was kept in a box in the desk, may have been cash received from current business operations, and the amount so kept may have varied from time to time. Indeed, Howard Steppe, who worked for Wright and whose name was used by Wright in conducting the Mercury business, stated that on the occasions when he counted money with Wright at the Buick office it was after working hours when they were discussing "where we stood and what we had done and what we could do." The amounts which Wright carried on his person from time to time may also have been current business receipts. The evidence establishes that Wright did carry large sums of money on his person for the purpose of purchasing cars at auctions. In any event, none of the testimony establishes the amount of cash on hand as of December 31 of any of the particular years with which we are concerned. *312 With respect to the petitioners' contention that Wright had no cash at December 31, 1956, we note that one of the witnesses stated that he and Wright counted $20,000 in October or November of 1956, and another stated that he had seen Wright with large amounts of cash both before and after 1956. As pointed out in the Findings of Fact, Wright did not, at the beginning of the investigation, advise the revenue agent that he had a hoard of cash which would account for any increase in net worth during the years in question; rather, he stated that he did not keep large sums of money on hand. Later in the investigation he did state that he had such a hoard, but he advised the investigating agents that he had not kept a record of such cash. Under these circumstances, the revenue agent calculated the amount of cash which Wright had on hand at the pertinent dates by the use of the "cash flow" method, as described in our Findings of Fact, using as a starting point the amount of cash which Wright had represented in a financial statement to General Motors dated January 25, 1950, that he had on hand, and adding known cash receipts and subtracting known cash outlays. Each time the agent encountered *313 a deficit cash balance he carried forward a balance of zero, rather than the deficit balance, thereby giving Wright credit for available cash in an amount sufficient to account for the cash expenditures up to that point. The agent conceded that when, in his computation from time to time, a deficit balance was shown this indicated that cash had been available, the source of which he could not determine. [7] However, he stated that under the circumstances the results which his computation showed were as close as he could calculate the cash on hand at the pertinent times. Since the respondent had no definite means of determining more precisely the amount of cash which the Wrights had on hand, we think he was justified in resorting to the method described. We cannot conclude that the use of this method was arbitrary or resulted in a clearly erroneous result. *314 From the record we cannot conclude that the petitioners have proven that at December 31, 1953, Wright had any greater amount of cash on hand than was calculated by the agent, and determined by the respondent. Rather, we think that an analysis of Wright's income and expenditures indicates the improbability that he had on hand at that time cash in excess of that determined by the respondent. Wright testified that in 1944 he had cash, including the secret hoard, of $85,000 to $90,000. From 1944 until the time Wright started operating the Buick business in May 1950, he had expended about $56,500 for various rental properties, a building and lot for the Buick business, and machinery and equipment for such business. He had also purchased additional rental property consisting of the Johnson garage, a small storage building, and a gas station on West End, and has expended money to equip and stock another gas station, all at a claimed cost of about $22,000 (although as pointed out above, we have not determined the precise amount of the cost thereof and have not included any cost of such additional property in our revised net worth computation). During that period Wright loaned cash to various *315 individuals, which had not been repaid, in the amount of $14,300. Wright also testified that he probably had invested in excess of $10,000 in inventory to start the Buick business. During this period, of course, living and other family expenses were incurred, including medical expenses. During the period from 1944 through 1949, the Wrights filed no income tax returns up to and including 1947. For 1948 a return was filed showing no tax liability, and in 1949 Wright's return showed net income of only about $2,500, this being from rentals. This would seem to indicate that during this period the Wrights had not received large amounts of income. In fact, the evidence establishes that during that period Wright was ill, undergoing an operation in 1944, that he did not carry on regular work, and that his chief source of income was from rentals. From this it would seem apparent that even if it were assumed that in 1944 Wright had cash in the amount of $85,000 to $90,000, it would have been expended by the time he commenced the conduct of the Buick business in May 1950. It follows, therefore, that any cash which Wright had on hand at December 31, 1953, would have come principally [8] from rentals *316 and from profits from the Buick business, since he and his bookkeeper both testified that repayments of nonbusiness loans were deposited in the business bank account. The Wrights' income tax returns for the years 1950 to 1953, inclusive, reflect net income or profits from these sources (after adding back depreciation claimed) in the aggregate amount of $70,866.37, the income from the Buick business being computed on an accrual method. Of this income there would not be available to Wright as cash on hand at December 31, 1953, the amount of $17,593.39 representing the balance in the dealer reserve accounts, the amount of $6,085.82 representing accounts receivable, and the amount of $9,306.05 representing the balance in the bank accounts, at December 31, 1953. From the beginning of the Buick business until the end of 1953 Wright expended a total of $9,496.28 for a second lot, machinery and equipment for the Buick Company, and a new building for the Buick Company. During that period he also paid income taxes totaling $12,794.85. During such period he also loaned money to individuals, which had not been repaid by the end of 1953, in the amount of $15,286.67. In addition, of course, for *317 these four years expenditures continued for family and personal expenses. Accordingly, it would be extremely improbable or unlikely that Wright could have had cash on hand at December 31, 1953, in such a large amount as he claims. Nor, in our opinion, has the petitioner shown error in the respondent's determination of cash on hand as of December 31, 1954 and December 31, 1956. However, believing as we do that Wright did keep cash on hand in sizable amounts, and in view of the fact that in January 1956, he made cash expenditures in the total amount of $8,337.50 (for purchase of Ford Motor Company stock and to make a loan), we think that some amount should be included as cash on hand at December 31, 1955. The inclusion of an amount of cash at that date, rather than the zero which the respondent determined, will not affect the over-all taxable income of the Wrights for the whole net period, but will reallocate that income between the taxable years 1955 and 1956. Using our best judgment, *318 we have concluded and have found as a fact that at December 31, 1955, Wright had cash on hand in the amount of $5,000, and we have included that amount in our revised net worth computation. Revised Net Worth Computation Giving effect to the necessary corrections in the respondent's net worth computation we have computed the Wrights' taxable income for the taxable years 1954, 1955, and 1956 to be in the respective amounts of $16,595.46, $19,289.22, and $20,424.90. Decision will be entered under Rule 50. Footnotes
*. (loss)↩
1. Also, the respondent has conceded that his net worth computation should be revised in certain respects. In this connection it should be pointed out that where error has been shown with respect to a separable part of the respondent's determination, and if the error does not reveal a careless or arbitrary attitude on the part of the respondent, then the presumption of correctness remains as to the other items composing the deficiency determination. Hoffman v. Commissioner, (C.A. 3) 298 F. 2d 784Anderson v. Commissioner, (C.A. 5), 250 F. 2d 242, certiorari denied 356 U.S. 950; Clark v. Commissioner, (C.A. 9), 266 F. 2d 698; and Goldberg v. Commissioner, (C.A. 5) 239 F. 2d 316↩.
2. The respondent concedes that the note of February 7, 1952, executed by Norvel Williams and Zimir E. Oglesby in the amount of $645, was repaid during the taxable year 1954.
3. Sec. 4361 of the Internal Revenue Code of 1954 imposes a tax at the rate of $.55 per $500 of value or fraction thereof on each deed, instrument or writing by which real property is conveyed to a purchaser or purchasers, when the consideration or value is over $100. Sec. 4384 of the Code makes both parties to a transaction liable for the documentary stamp tax. See sec. 47.4384-1 of the Documentary Stamp Tax Regulations, 26 CFR, part 47↩.
4. We note in passing that the deed to this property was made in favor of the Wrights' two minor children. If this actually vested them with title to the property, the question might be raised whether it is proper to include this property among the assets owned by Wright and his wife. However, neither party raises the point and apparently Wright considered this his property, since we may assume that the cattle barn on which he claimed depreciation in his returns was this same barn. It may be pointed out further that in any event the computation of income by the net worth method would not result in a different result if the barn were eliminated from Wright's assets as of the end of the year 1955, since in that event he would be chargeable with a nondeductible expenditure which would be added to his increase in net worth for that year.
5. There was introduced into evidence a check dated October 2, 1954, drawn by Mrs. Joe Wright against the Buick Company account in favor of O. D. Nolen in the amount of $7,500, which was endorsed by Nolen and Mrs. Joe Wright. Nolen testified that sometime after the transaction was consummated the Wrights asked him to endorse this check and that he did so, although Wright did not tell him his reason for wanting him to endorse such check. Wright testified that he carried this check around for some time and then had it cashed.↩
6. Wright had previously testified that the loan to MacDonald was $3,500. This appears to be correct since the petitioners had agreed by stipulation to the nonbusiness loans determined by the respondent as of December 31, 1956, which reflected a loan of $3,500 to one Benton McDaniel. Apparently this is merely a confusion of names - there being only the one loan to McDaniel in the amount of $3,500.↩
7. In this connection it may be pointed out that any deficit encountered by the agent prior to 1956 could not, under the petitioners' contention, be considered as accounted for to any substantial extent by outlays from a cash hoard, since Wright's testimony was to the effect that the great bulk of his claimed cash hoard was expended in 1956.↩
8. The revenue agent in his computation credited Wright with available cash in the amount of $3,000 borrowed from the bank in 1950 and $490 received in 1952 and 1953 in connection with a real estate transaction.↩